UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LORI M. WILLIAMS,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    Case No. 1:09CV183 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
            Defendant.               )

**MEMORANDUM AND ORDER**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

On April 5, 2007, plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of July 1, 2006 due to cervical spine problems, right hand dysfunction, right thumb problems, interstitial cystitis, thyroid problems, and tailbone problems. (Administrative Transcript ("Tr.") at 70-85; 113). Plaintiff's applications were initially denied, and she subsequently filed a request for a hearing by an administrative law judge ("ALJ"). (Tr. 61). On March 12, 2009, a hearing was held before an ALJ in Cape Girardeau, Missouri, during which plaintiff was represented by counsel. (Tr. 19-52). On May 26, 2009, the ALJ

-1-

issued his decision denying plaintiff's applications. (Tr. 7-18). Plaintiff subsequently filed a request for review of the hearing decision, (Tr. 5), and on November 4, 2009, the Appeals Council denied plaintiff's request for review.[1] (Tr. 1-4). The ALJ's decision thus stands as the Commissioner's final decision. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Hearing Testimony</u>

During plaintiff's administrative hearing, she testified that she was 41 years of age, and that she lived in a house with her husband and her 17-year-old stepson. (Tr. 22-23). She stated that she completed high school and an associate's degree, and would finish a bachelor's degree at Southeast Missouri University in May, 2009. (Tr. 23).

Plaintiff testified that she worked from 1992 to October 2005 as a full-time, freelance court reporter. (Tr. 25). She stated that she stopped working at this job due to neck pain that caused the nerves in her right arm and hand to malfunction. (<u>Id.</u>) She testified that her most recent employment was self-employment at her husband's business, Williams Fence Company, a business in which she was a partner. (Tr. 23-24). She stated that she worked from approximately 2004 to June, 2007, for three to five hours

---

[1] The Appeals Council indicated that it had reviewed additional evidence; namely, a letter from attorney Kim Heckemeyer. (Tr. 4). This letter appears in the Administrative Transcript at pages 150-52.

daily.[2]  (Tr. 24).

Plaintiff testified that she sought treatment from Dr. Matthew Gornet, and described such treatment as follows:

> He did some testing and essentially said that I had so much wrong with my neck that there was really nothing that he could do for me at that point.  He said that at that point the surgery that I would have needed was in the trial stages and that because I had so much wrong I didn't qualify for the surgery.  He said that he would also hesitate to operate on me until I really began to have a lot more issues.

(Tr. 26).

Plaintiff testified that she also saw Dr. Lee, and that he and Dr. Gornet were in agreement that she should not work as a court reporter, and that there was nothing that could be done for her except to give her muscle relaxers.  (Id.)  She testified that she took Cyclobenzaprine[3] every night, but rarely took it during the day because it made her drowsy.  (Tr. 27).  She stated that she also took a medication for depression, and an antibiotic for "an ongoing urinary issue." (Tr. 27-28).  Plaintiff testified that the medication she took for depression was helpful.  (Tr. 28).

When asked about her daily activities, plaintiff explained that she rose at 6:30 or 7:30 a.m., and took care of her personal needs.  (Tr. 29).  She stated that she had symptoms while

---

[2]The ALJ noted that earnings records indicated that plaintiff earned $11,727.00 in 2007, representing $1954.00 in monthly earnings for the first half of 2007, and that this work activity represented substantial gainful activity.  (Tr. 12).  Neither party contests this finding.

[3]Cyclobenzaprine, which is also sold under the brand name Flexeril, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

holding her hands up to comb or blow-dry her hair, but was still able to do these things. (Tr. 36). She stated that she made her bed, occasionally swept, did the cooking, and went to the grocery store. (Tr. 30). She testified that she spent most of her day working on her college assignments. (Tr. 29). She stated that she required frequent breaks due to tension and muscle spasm, and that during these breaks, she would stretch and do yoga-type exercises to release tension. (Tr. 29, 34). She testified that she was currently enrolled in 12 credit hours, and had taken that same course load the preceding semester. (Tr. 29-30). Plaintiff testified that she could lift 20 pounds, and could lift a gallon of milk in each hand, but not very high. (Tr. 31).

Plaintiff testified that she had never had shots or electrical stimulation to her neck, but that she did have electrical stimulation treatment to her shoulders and back. (Tr. 31-32). She testified that she could stand for about an hour before needing to sit down due to severe pressure on her tailbone. (Tr. 32). Plaintiff stated that the pain was "very random" and that there was "no rhyme or reason for it actually." (Id.) She stated that she could sit for extended periods of time, but had to move about and adjust her position to release tension that had built in her neck and back. (Tr. 32-33). Plaintiff testified that she had numbness and tingling in her right hand "approximately 80 to 90 percent of the time," and in her left hand "probably 30 to 40 percent of the time." (Tr. 33). She testified that she began experiencing these symptoms in the mornings after raising her hands

-4-

high to wash her hair, and that the symptoms continued until her muscle relaxer "kick[ed] in" that evening and she was lying down. (Tr. 33-34). Plaintiff testified that she took a multi-vitamin, a calcium supplement, and Claritin.[4] (Tr. 35). Plaintiff also testified that she took Tylenol and Ibuprofen due to daily headaches. (Id.) Plaintiff testified that the latter two drugs helped, but did not alleviate, her headaches. (Id.)

When asked about her college studies, plaintiff listed the college classes she was currently taking and testified that two of them were social work classes, which was going to be her area of study "this fall when I begin graduate school hopefully if I'm accepted." (Tr. 35-36). Plaintiff testified that she was pursuing an education with the intent to work in a different field, and that doing so had been recommended by Drs. Gornet, Lee, and Meyer. (Tr. 37-38). She testified that she intended to pursue her education and try to get out in the workforce again. (Tr. 40).

Plaintiff stated that she used a neck pillow while driving long distances, which she did often because she lived out in the country. (Tr. 36). She stated that she drove long distances three times per week to attend class. (Tr. 37).

Plaintiff testified that her conditions precluded her from enjoying hobbies she once enjoyed, such as stained glass, yoga, taking her dogs to obedience class, and gardening. (Tr. 38). She testified that she had some problems related to depression, but

---

[4]Claritin, or Loratadine, is used to temporarily relieve allergy symptoms. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html

that her medication helped her.  (Id.)  She stated that getting out
of bed and doing what needed to be done felt like more work than it
should, and described feeling a general sadness.  (Id.)

Plaintiff stated that her neck problems were caused by a
congenital defect.  (Tr. 39).  Plaintiff testified that she also
had some random urinary-type problems, and an occasional
hypersensitivity on the underside of her arm.  (Tr. 39-40).

The ALJ then heard testimony from Darrell Taylor, Ph.D.,
a vocational expert ("VE").  Dr. Taylor testified that plaintiff's
past work as a court reporter was classified as sedentary and
skilled, and that her job at her husband's company was classified
as sedentary and semi-skilled.  (Tr. 42).  The ALJ asked Dr. Taylor
to assume a hypothetical individual of plaintiff's age, education
and work experience who could lift 10 pounds occasionally and
frequently; stand and/or walk for two hours in an eight-hour
workday; and sit for six hours with normal breaks; but who should
not climb, crawl, be exposed to vibration, work at unprotected
heights, or work around dangerous machinery.  (Tr. 44-45).  Dr.
Taylor testified that such an individual could perform past
relevant work.  (Tr. 45).  The ALJ then amended the hypothetical to
include no work bilaterally above shoulder level, and Dr. Taylor
testified that such limitation would not change his opinion.  (Id.)
The ALJ then amended the hypothetical to include a person who was
unable to distinguish texture and temperature and such things with
the fingers, but who remained able to do fine fingering, and Dr.
Taylor testified that such limitation would not preclude the

performance of plaintiff's past relevant work. (Id.) Dr. Taylor testified that, if such a person were limited to simple and/or repetitive work, plaintiff's past relevant work would be precluded. (Id.)

Dr. Taylor testified that the sedentary and unskilled positions of hand packer and assembler production worker existed in significant numbers in the state of Missouri. (Tr. 46). Dr. Taylor testified that if a limitation were added to allow the person discretion in sitting and standing through the workday, the number of available positions would decrease by 50 percent. (Id.) Dr. Taylor testified that if the person had to miss more than two days of work monthly, it would preclude competitive employment in those unskilled positions, and in plaintiff's past work. (Tr. 46-48).

B. <u>Medical Records</u>

The record indicates that plaintiff was seen in the emergency room of St. Francis Medical Center in 1996 and 1997 with complaints related to pain in her thigh, and to what was potentially a poison ivy rash. (Tr. 153-62). She was also seen on November 29, 1998 with complaints of pain upon urination, stating that she had experienced frequent urinary tract infections. (Tr. 163-67). She was given an antibiotic and released. (Id.) Plaintiff was seen again on April 6, 2000, with complaints of abdominal pain, and was diagnosed with gastritis. (Tr. 168-172). She returned on June 5, 2000, and again on June 7, 2000, with complaints related to a poison ivy rash on her back, abdomen and

extremities. (Tr. 173-80). Plaintiff returned to St. Francis on November 18, 2001 with complaints related to poison ivy. (Tr. 181-86).

An MRI performed at Cape Imaging MRI on October 22, 2002 showed "anomalous development of the cervical spine with failure of segmentation at C2-C3, C3-C4, and C6-C7," but was negative for focal disc protrusion. (Tr. 211).

Plaintiff returned to the emergency room of St. Francis Medical Center on May 24, 2003 with eye complaints, and was diagnosed with conjunctivitis. (Tr. 187-91). The St. Francis records indicate that plaintiff was seen on two additional occasions for complaints related to poison ivy and sinus problems, but the dates of these visits are illegible. (Tr. 197-202). Finally, on September 29, 2003, she was seen for complaints related to poison ivy/poison oak exposure. (Tr. 203-05).

The Administrative Transcript contains records from the Meyer Chiropractic Center, Roy Meyer, D.C., indicating that plaintiff was seen on numerous occasions from July 27, 2004 through April 24, 2007. (Tr. 217-22).

Plaintiff returned to Dr. Meyer on January 17, 2006, with complaints of neck spasm after reaching out and up, and complaints of neck and shoulder pain, spasms, and burning at the T1 area. (Tr. 286). Dr. Meyer's office note indicates that plaintiff had discomfort in T1 and C7, and that cervical extension "feels good." (Tr. 287). Cervical lateral flexion was within normal limits bilaterally. (Id.) He noted that plaintiff's hands felt cold, and

she was apparently able to complete cervical rotation to 20 degrees on the left, and 30 degrees on the right. (Id.) The undersigned cannot interpret, within a reasonable degree of certainty, the remainder of Dr. Meyer's office note.

On January 30, 2006, Dr. Meyer wrote to Matthew F. Gornet, M.D., indicating that he was referring plaintiff for evaluation of cervical complaints stemming from "several cervical congenital malformations" that were "creating long term cervical pain and brachial plexus involvement." (Tr. 258). Dr. Meyer wrote that plaintiff had stopped working as an independent stenographer, and that her daily activities were very restricted. (Id.)

Plaintiff saw Dr. Gornet on February 6, 2006 for evaluation of neck pain to both shoulders and upper back, with headaches and tingling in her hands. (Tr. 289). Plaintiff stated that her problems began on September 7, 2005 while taking a long deposition, at which time she developed numbness and tingling in her hands. (Id.) She stated that chiropractic treatment helped, but that her symptoms had returned. (Id.) Plaintiff described her symptoms as intermittent, worse with any type of arm activity including extension, lifting, and turning her head to the left. (Id.) She denied weakness, bowel or bladder symptoms, or night pain. (Tr. 289).

Upon physical examination, Dr. Gornet noted that plaintiff had decreased range of motion in all directions of her spine, and that turning to the left and extension exacerbated her pain. (Id.) Motor examination revealed 5/5 strength in all

groups. (Id.) Dr. Gornet noted that radiographs revealed congenital fusion from C2 to C5, and from C6 to C7. (Tr. 289-90). He ordered an MRI. (Tr. 290).

Plaintiff returned to Dr. Gornet on March 30, 2006. (Tr. 291). Dr. Gornet noted that plaintiff's MRI revealed no obvious or large disc herniation, and opined that plaintiff probably had discogenic neck pain. (Id.) Dr. Gornet also noted that plaintiff's neck pain had improved. (Id.) Dr. Gornet prescribed Flexeril, and advised that plaintiff could follow up as needed. (Id.)

On April 28, 2006, plaintiff presented to the emergency room of St. Francis Medical Center with complaints related to a poison ivy rash on her arm. (Tr. 295-99). Plaintiff returned on May 3, 2006 with the same complaints, stating that her rash had worsened. (Tr. 300-04).

The record indicates that plaintiff saw Charles Lastrapes, M.D., on July 14, 2006 for a thyroid check, and also for complaints of a sore throat and ear ache. (Tr. 312). She complained of fatigue and an inability to lose weight, chronic neck pain, and headaches. (Id.) Upon examination, Dr. Lastrapes noted multiple congenital spinal anomalies, but also indicated that plaintiff's neck was supple, and that plaintiff had normal range of motion of her neck. (Id.) He diagnosed plaintiff with dyspepsia, bloating and constipation, and allergic rhinitis. (Id.)

The record indicates that an ultrasound of plaintiff's thyroid, ordered by Dr. Meyer and performed at Cape Radiology Group

on September 29, 2006, revealed a nodule in the right lobe of plaintiff's thyroid. (Tr. 256).

Plaintiff subsequently saw Jan Seabaugh, M.D., on October 18, 2006 with complaints of neck problems, and gave the history of having been diagnosed with the thyroid nodule. (Tr. 215). Dr. Seabaugh ordered a thyroid panel and performed fine needle aspiration testing of the nodule. (Id.) Plaintiff also gave a history of having migraine headaches related to her menstrual cycle. (Tr. 214-15).

On October 23, 2006, Dr. Seabaugh noted that plaintiff's thyroid profile and testing were normal, and recommended that plaintiff undergo a biopsy of the nodule. (Tr. 213, 210).

Plaintiff returned to Dr. Lastrapes on November 3, 2006 with complaints related to a thyroid mass. (Tr. 311). Dr. Lastrapes noted that plaintiff had seen Dr. Seabaugh and that a thyroid nodule had been discovered. (Id.) Dr. Lastrapes recommended that the nodule be evaluated. (Id.)

On November 9, 2006, plaintiff was seen by Gershon Spector, M.D., of the Washington University Department of Otolaryngology, for evaluation of the thyroid nodule. (Tr. 315-20). Plaintiff indicated that she was employed full-time as a business owner of Williams Fence Company. (Tr. 319). She indicated that she suffered from, inter alia, headaches, joint pain and stiffness, and tingling and numbness. (Tr. 320). Under "past medical history," Dr. Spector wrote "[g]ood. She has no serious illnesses." (Tr. 315). Plaintiff noted that she was taking a

-11-

birth control pill, and Cyclobenzaprine. Upon examination, Dr. Spector noted that plaintiff was in no acute distress, but that she did have stiffness and an inability to move her neck. (<u>Id.</u>) He ordered an ultrasound. (Tr. 316).

On November 24, 2006, plaintiff underwent a neck ultrasound and needle biopsy of her thyroid nodule, which revealed no malignancy. (Tr. 321-22). Plaintiff returned to Dr. Spector on November 30, 2006, and was advised that the nodule was benign. (Tr. 314). On that same date, Dr. Spector wrote to Dr. Lastrapes, opining that testing indicated that the nodule was most likely a goiter formation. (Tr. 243). Dr. Spector opined that plaintiff should continue to follow up with Dr. Lastrapes for annual thyroid function testing. (<u>Id.</u>) Dr. Spector also wrote that plaintiff should return to see him if there was any neck mass enlargement, and also wrote that plaintiff should begin taking low doses of Synthroid[5] to prevent the thyroid nodule from enlarging. (<u>Id.</u>)

On December 5, 2006, plaintiff was seen at Cape Girardeau Urology Associates, Inc., by Jamie Outman, M.D. (Tr. 248). Dr. Outman noted plaintiff's history of recurring urinary tract infections, pelvic and bladder pain, and present complaints of mild discomfort upon urination, difficulty urinating, and a sensation of incomplete emptying of the bladder. (<u>Id.</u>) Upon examination, Dr. Outman noted that plaintiff was in no distress, and that her neck

---

[5]Synthroid, or Levothyroxine, is a thyroid hormone used to treat hypothyroidism, a condition in which the thyroid gland produces insufficient amounts of thyroid hormone.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html

was supple.  (Id.)  She had no flank pain upon palpation, and no swelling in her extremities.  (Id.)  A CT scan showed no upper tract abnormalities, and Dr. Outman scheduled further testing. (Tr. 248).

On December 6, 2006, plaintiff saw Dr. Meyer with complaints of numbness in her tailbone area that radiated outwards. (Tr. 274).  Upon examination, Dr. Meyer found plaintiff's dorsolumbar flexion to be within normal limits, but appeared to note some limitations when testing plaintiff's rotation and flexion in other areas.  See (Tr. 275).  It appears that Dr. Meyer found a decrease in sensation in plaintiff's hips bilaterally, but unfortunately, Dr. Meyer's handwriting is mostly illegible.  See (Id.)

On December 7, 2006, plaintiff underwent an MRI evaluation of her lumbosacral spine, which revealed no evidence of disc pathology, and minimal facet degenerative change, from L2-L3 to L5-S1.  (Tr. 224).

On December 11, 2006, Dr. Meyer referred plaintiff to David Lee, M.D., a neurologist, for neurological evaluation of plaintiff's complaints of bilateral hip numbness which had begun during the first of the month, and which had progressed to involve plaintiff's left leg and foot.  (Tr. 245-46).

Plaintiff saw Dr. Lee the following day, December 12, 2006. (Tr. 331-33).  Dr. Lee noted that plaintiff had experienced bilateral arm pain and numbness since 1989, and subsequently developed posterior neck pain.  (Tr. 331).  Plaintiff reported

that, in September of 2005, while taking a long deposition, both of her hands became numb, the numbness spread up both of her arms, and she developed posterior neck spasms, which were worse on the right side. (Id.) Plaintiff testified that these symptoms lasted four to five months. (Id.) Dr. Lee noted that plaintiff had developed numbness over both buttocks and the backs of both thighs, calves and feet, and had some lower back pain, but remained ambulatory. (Id.) He noted that plaintiff worked for her husband's fence company. (Tr. 332).

Upon physical examination, Dr. Lee noted that plaintiff was in no distress, and that her neck was supple with full range of motion. (Id.) She denied pain in her posterior neck. (Id.) Plaintiff had a mild spinal curvature, but there was no pain on palpation of the thoracic or lumbar spine, and plaintiff had normal range of motion. (Id.) Upon neurological examination, Dr. Lee noted decreased pinprick sensation in several areas. (Tr. 332). Straight leg raise testing was negative. (Id.) Plaintiff had no pain on palpation of the thoracic or lumbar spine, and range of motion was normal. (Id.) Dr. Lee's impression was that plaintiff exhibited mild sensory impairment on the posterior and medial aspect of both thighs and buttocks, and good power in all four limbs. (Tr. 333). Dr. Lee wrote that plaintiff did not display any long tract signs to suggest spinal cord involvement, but that, because plaintiff exhibited findings on ankle jerk testing, peripheral neuropathy should be ruled out. (Id.) Dr. Lee also opined that plaintiff had neck and bilateral arm pain, but that her

-14-

findings were not indicative of cervical radiculopathy or myelopathy. (Id.) Dr. Lee ordered MRI examinations of plaintiff's cervical and thoracic spinal cord and an MRI of her brain if indicated. (Id.) Dr. Lee noted that plaintiff began having trouble with urination around November 16, 2006, and that a pelvic CT scan was unremarkable. (Tr. 331). He recommended that plaintiff see Dr. Outman. (Tr. 333).

On December 13, 2006, plaintiff returned to Dr. Lastrapes with complaints of bilateral leg numbness. (Tr. 310). Dr. Lastrapes' assessment was parasthesias. (Id.)

On December 15, 2006, plaintiff underwent a cervical MRI at St. Francis Medical Center. (Tr. 305-06). It was noted that plaintiff had a developmental deformity of the base of her skull, and congenital fusion of C2 through C4, and C6 and C7. (Tr. 305). There were minimal bulges at C5-6 and C7-T1, but it was noted that they did not touch the spinal cord or produce significant stenosis. (Tr. 306). A thoracic spine MRI performed on this same date revealed the congenital condition described above, and also revealed minimal mid-thoracic spondylosis, tiny upper and mid-thoracic disk bulges, no thoracic stenosis or cord compression, and no definitive multiple sclerosis plaques in the spinal cord. (Tr. 307-08).

On December 18, 2006, Dr. Outman performed urological studies which were normal with the exception of "rather significant interstitial cystitis." (Tr. 244). Plaintiff was subsequently

seen in follow up, and was prescribed Elmiron[6] and advised to return in six weeks. (<u>Id.</u>)

Plaintiff returned to Dr. Outman for follow-up on December 26, 2006. (Tr. 325). Dr. Outman noted that plaintiff's exam was benign, discussed Elmiron therapy, and advised plaintiff to follow-up in six weeks. (<u>Id.</u>) Plaintiff returned on February 5, 2007, and it was noted that she was continuing to improve after only one month of therapy. (<u>Id.</u>) Plaintiff reported less trouble with urination, and also reported a reduction in low back pain and complaints. (<u>Id.</u>)

On December 28, 2006, plaintiff underwent an MRI of her brain at St. Francis Medical Center, which was negative for multiple sclerosis plaque, and was within normal limits with the exception of mild inferior right maxillary sinus mucosal disease, and a tiny left maxillary sinus mucous retention cyst. (Tr. 334-35).

An electromyogram - nerve conduction study performed on January 3, 2007 at St. Francis Medical Center revealed mild right deep peroneal neuropathy and right deep peroneal neuropathy. (Tr. 236-37). Nerve conduction study of plaintiff's left peroneal, bilateral tibial, sural, and superficial peroneal nerves was normal. (<u>Id.</u>)

In his January 16, 2007 correspondence directed to Dr.

---

[6]Elmiron, or Pentosan Polysulfate, is used to relieve bladder pain and discomfort related to interstitial cystitis, a disease that causes swelling and scarring of the bladder wall. It works by preventing irritation of the bladder walls. <u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602007.html</u>

Lee, Dr. Meyer noted that plaintiff had been seen on four occasions for acupuncture, and as a result had no tailbone pressure. (Tr. 242). Dr. Meyer noted that plaintiff had intermittent low back pain of 1 on a 1-10 scale, and no numbness in her hips or pelvic region. (Id.) Dr. Meyer noted that plaintiff's lower extremity parasthesia was "almost gone." (Id)

On January 20, 2007, Dr. Lee wrote to Dr. Meyer regarding his impressions of plaintiff's condition following his evaluation. (Tr. 329). Dr. Lee wrote that plaintiff did not have multiple sclerosis, and that her cervical spine abnormalities were not new and were not responsible for her bilateral leg numbness complaints. (Id.) Dr. Lee wrote that, when he saw plaintiff in late December, she was doing well, with the exception of a pressure sensation over her tailbone. (Id.)

On June 6, 2007, Medical Consultant M. Huggins completed a Physical Residual Functional Capacity Assessment. (Tr. 336-41). It was opined that plaintiff could lift 10 pounds (frequently and occasionally); stand/walk for at least two hours in an eight-hour workday; sit with normal breaks for about six hours in an eight-hour workday; and push and/or pull without limitation. (Tr. 337). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 339-40). It was noted that plaintiff reported waking frequently to adjust her pillow for neck support, and that raising her arms caused muscle fatigue and neck spasm. (Tr. 341). It was noted that plaintiff reported needing help with some kitchen duties, and that she had to sit every five

to ten minutes, or sit on a stool, while cooking. (<u>Id.</u>) It was noted that plaintiff reported being able to drive, and that she could lift no more than ten pounds and walk less than one half of a mile. (<u>Id.</u>) It was noted that the severity of the complaints plaintiff described was inconsistent with the medical evidence of record, and that her complaints were only partially credible. (<u>Id.</u>) It was noted that plaintiff did have significant back impairments, but had full neck range of motion as of her last evaluation. (Tr. 341). It was also noted that plaintiff's lumbar MRI showed only mild findings. (<u>Id.</u>)

On September 17, 2007, Dr. Meyer wrote a letter on plaintiff's behalf related to her claims for benefits. (Tr. 344-45). He wrote that the congenital fusions in plaintiff's cervical spine could "be aggravated very easily depending on the functional demands placed on them." (Tr. 344). Dr. Meyer wrote that plaintiff began gradually suffering cervical and thoracic pain, stiffness, and muscle spasms while working as a court reporter. (<u>Id.</u>) Dr. Meyer then wrote:

> Court reporting is a very demanding profession requiring sitting at times all day with no scheduled breaks. They are also required to sit in whatever chair is available in the attorney's office or court room whether it is appropriate for their body or not. As they speed type on steno machines, they have no arm rests to support their arms, hands, neck or upper back. Certified court reporters must be able to type 225 words per minute. This in itself is stressful and further complicates their situation.
>
> This patient, due to her congenital cervical defects and the above reasons, in my

chiropractic opinion, is unable to continue in this profession. Two years ago, I specifically recommended that the patient seek another line of work that would be more suitable for her neck, shoulders, and back.

(Tr. 344-45).

The record indicates that plaintiff saw Dr. Meyer on numerous occasions from September 25, 2007 through approximately December 3, 2007. (Tr. 350 ). On November 7, 2007, plaintiff saw Dr. Meyer with complaints of an exacerbation on November 5, 2007 when removing her shirt over her head. (Tr. 349). Plaintiff indicated that the felt immediate intense pain and numbness/tingling on the left side of her neck, left trapezius, and left arm and hand, and stated that she took medication and used ice and heat to relieve the pain. (Id.) Plaintiff wrote that she did not seek any other medical care for this injury. (Id.)

The record indicates that Dr. Meyer completed a Physician's Statement For Disabled Licence Plates/Placard on March 21, 2008, and checked a box marked "permanent disability." (Tr. 375). The form states that the statement was valid for 90 days. (Id.)

The record indicates that plaintiff saw Dr. Meyer on July 10, 2008 with complaints of sensitivity, discomfort and pain on the inside/back of her upper right arm and the back of her forearm; right hand numbness; "underarm same as arm," and pain in her back and chest. (Tr. 377-78). She indicated that she had done "nothing" try to relieve her symptoms, and had sought no other medical treatment. (Tr. 377). The form entitled "Brief Physical

-19-

Examination" lists only plaintiff's complaints, and does not list any of Dr. Meyer's findings upon exam. (Tr. 378). On October 8, 2007, Dr. Meyer noted that plaintiff was "doing great." (Tr. 350).

### III.    The ALJ's Decision

The ALJ in this case determined that plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2011. (Tr. 10, 12). The ALJ determined that plaintiff had engaged in substantial gainful activity subsequent to September 7, 2005, which the ALJ noted was plaintiff's alleged onset date, inasmuch as plaintiff had average monthly earnings of more than $900.00 per month during the first half of 2007.[7] (Tr. 12). The ALJ determined that plaintiff had not engaged in substantial gainful activity since July 1, 2007. (Id.)

The ALJ determined that plaintiff had the severe impairments of degenerative disc disease of the cervical spine, residuals of remote status post surgical right hand tendon transplant, and mild right lower extremity deep peroneal

---

[7]While the ALJ wrote that plaintiff had alleged disability beginning September 7, 2005, the record indicates that plaintiff, in her applications, alleged disability beginning July 1, 2006. (Tr. 72, 80). Plaintiff alleges no error in the ALJ's statement regarding her alleged onset date (and in fact uses the date "September 2005" in her briefs) and alleges no error in the ALJ's decision regarding her substantial gainful activity. Even so, the undersigned notes that the ALJ's decision would have been the same regardless of which onset date he used. See Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (concluding that any error on the part of the ALJ was harmless because there was "no indication that the ALJ would have decided differently" in the absence of the error). The ALJ's determination that plaintiff engaged in substantial gainful activity subsequent to her alleged onset date would be the same regardless of which onset date was used, and the ALJ's determination that plaintiff was not disabled "from September 7, 2005 through the date of this decision" (Tr. 18) encompasses the July 1, 2006 onset date plaintiff alleged in her applications.

neuropathy, but that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 12-15).

In analyzing plaintiff's credibility, the ALJ in this case cited 20 C.F.R. § 404.1529 and 416.929, the Regulations corresponding with the Eighth Circuit's decision in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), listed the factors therefrom, thoroughly analyzed plaintiff's testimony and the evidence of record, and discredited plaintiff's allegations of pain and other symptoms precluding all work. The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except for lifting or carrying more than ten pounds; standing or walking more than two hours in an eight-hour workday; sitting more than six hours in and eight-hour workday with normal work breaks; crawling or climbing ladders, ropes or scaffolds; working overhead with bilateral upper extremities; performing work tasks requiring distinguishing texture or temperature with her fingers; and exposure to whole body vibration or hazards. (Tr. 15-17). The ALJ concluded that plaintiff was capable of performing her past relevant work as a court reporter, medical transcriptionist, and office clerk, inasmuch as that work did not require the performance of work-related activities precluded by plaintiff's residual functional capacity. (Tr. 18). The ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from September 7, 2005 through the date of the

decision.

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or

combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, at the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even when two inconsistent conclusions can be drawn from the evidence, the reviewing court may still find that the Commissioner's decision is supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A reviewing court may not reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary

outcome." Pierce v. Apfel, 173 F.3d 704, 706 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

In the case at bar, plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, raising several points in support. Plaintiff argues that the ALJ placed undue emphasis on the report of a lay examiner, and that the lay examiner's report differed from the opinion of Dr. Meyer, and was not based upon medical evidence later placed in the record. Plaintiff also contends that the ALJ improperly weighed Dr. Meyer's opinion and misinterpreted the Regulations when he noted that chiropractors were not considered "acceptable sources" thereunder. Plaintiff also contends that the ALJ should have sent plaintiff for an orthopedic evaluation, or asked for a more detailed report from one of her physicians. Plaintiff argues that the ALJ failed to properly consider her headaches and arm spasms, and the ALJ's hypothetical to the VE was defective because it did not include reference to those complaints. Plaintiff argues that the medical evidence does not support the ALJ's conclusion that she remains able to perform her past relevant work as a court reporter, and contends that the only residual functional capacity assessment supported by the record is that she cannot report to work on a consistent basis, and this Court should therefore reverse with directions to award benefits. Plaintiff also argues that the ALJ improperly discredited her subjective complaints. In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

A.   Credibility Determination

Although plaintiff alleges several points of error in the ALJ's credibility determination, review of the record reveals no error.   The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.   Id. at 1321-22.   In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole.   Id.   The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working.   Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).   The foregoing Polaski

factors are to be considered in addition to the objective medical evidence of record. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

Plaintiff alleges that the ALJ erroneously considered her minimal or conservative medical treatment as detracting from her credibility. Plaintiff argues that her medical treatment rose above the level of minimal or conservative because she had visited Dr. Meyer many times, and had also been referred for neurological consultation. Review of the record reveals no error. The Eighth Circuit has recognized that allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment. Loving v. Dep't. of Health & Human Services, 16 F.3d 967, 970 (8th Cir. 1994). While plaintiff did see Dr. Meyer many times, she was treated with conservative measures throughout her treatment with Dr. Meyer and, in fact, throughout her treatment history with all of the physicians of record. The ALJ wrote that plaintiff required only minimal or conservative medical treatment. (Tr. 16) (emphasis

added).  It cannot be said that the ALJ's consideration of the character of plaintiff's medical treatment was erroneous.

Plaintiff next argues that the ALJ erroneously considered her lack of strong prescription pain medication as inconsistent with her allegations of disabling pain, arguing that she in fact took Flexeril (Cyclobenzaprine).  As defined above, however, Flexeril is a prescription muscle relaxer, as opposed to a prescription narcotic pain medication.  More compelling, however, is the fact that Flexeril was the only prescription medication plaintiff used.  Limited use of prescription pain medication does not support allegations of disabling pain.  Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); see also Cruse, 867 F.2d at 1187 (minimal consumption of pain medication reveals lack of disabling pain).  It therefore cannot be said that the ALJ erred in considering the lack of strong prescription pain medications as one of the many factors detracting from plaintiff's credibility.

Plaintiff also suggests that the ALJ erroneously observed that the record failed to document that she required the use of orthotic or assistive devices, arguing that she in fact used a neck pillow, and had used a neck brace in the past.  Review of the record reveals no error.  The ALJ actually wrote that plaintiff did not require "the use of prescribed orthotic or assistive devices." (Tr. 16) (emphasis added).  While the undersigned does not doubt that plaintiff may have chosen to use a neck pillow and that she may have also used a neck brace in the past, the record fails to document that either of these items, or any other orthotic or

assistive devices, were ever prescribed for her by a doctor. The undersigned concludes that the ALJ properly considered the fact that plaintiff did not require the use of prescribed orthotic or assistive devices.

Plaintiff next challenges the ALJ's observations regarding sensory loss, arguing that Dr. Lee's December 2006 examination contains evidence of sensory loss, abnormal gait, and neurological defects. However, as noted in the above summary of the medical information of record, while Dr. Lee did find decreased pinprick sensation in several areas and evidence that plaintiff's gait was a little unsteady, he characterized her sensory impairment as mild, and noted that she had good power in her extremities and displayed no long tract signs to suggest spinal cord involvement. See (Tr. 333). As the Commissioner correctly notes, the ALJ in this case wrote that there was no evidence of "significant" neurological deficits. (Tr. 16). Dr. Lee's findings suggest only mild, not significant, neurological deficits, and do not detract from the ALJ's adverse credibility determination.

The ALJ in this case noted that plaintiff's daily activities were inconsistent with her allegations of disabling symptoms, inasmuch as plaintiff was able to live and function independently, perform light household chores, go grocery shopping, drive a car, and attend college. Indeed, plaintiff testified that she took care of her personal needs, performed light housework, shopped for groceries, regularly drove for long periods of time because she lived in the country, and regularly attended college

with the intent of completing her undergraduate degree and continuing on to graduate school. These activities are significant; they demonstrate plaintiff's ability to sustain activities and interests over a period of time; and they demonstrate plaintiff's ability to function independently. See Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citation omitted) (Consideration should be given to the quality of a claimant's daily activities; to her ability to sustain activities and interests; to the frequency, appropriateness and independence of the activities; and to claimant's ability to relate to others over a period of time). In addition, activities similar to plaintiffs have previously been recognized as inconsistent with a finding of disability. See Young, 221 F.3d at 1069 (plaintiff cooked, cleaned, did laundry, shopped, studied Russian, and exercised); Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999) (plaintiff drove, shopped, visited his mother, took breaks with his wife between her classes, watched television, played cards); Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (plaintiff dressed and bathed herself, and did some housework, cooking and shopping). In this case, recognizing that a claimant need not be bedridden to qualify for benefits, Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998), the undersigned concludes that the ALJ in this case properly considered plaintiff's daily activities as detracting from her credibility.

The ALJ noted that plaintiff's subjective complaints were not supported by or consistent with the clinical signs, symptoms

and findings of the objective medical evidence of record, inasmuch as physical examinations and diagnostic testing results showed some abnormalities, but none of a disabling frequency, severity, and duration. As noted above, in March of 2006, Dr. Gornet noted that plaintiff's neck pain had improved; and in December of 2006, Dr. Lee noted that plaintiff's neck was supple with full range of motion. In addition, the record does not indicate that plaintiff consistently complained of right hand symptoms, nor does the medical evidence support plaintiff's allegations of disabling neuropathy. In January of 2007, Dr. Meyer noted that plaintiff had no tailbone pressure or numbness in her hips or pelvic region; that her lower extremity parasthesia was almost gone, and that nerve conduction study was unremarkable with the exception of isolated right deep peroneal neuropathy. The lack of medical evidence to support plaintiff's complaints, and the evidence that in fact contradicts her complaints, supports the ALJ's determination. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (the lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

The ALJ noted that plaintiff's work activity during the period she alleged disability detracted from her credibility, and concluded that work activity, even that which could not be

considered substantial gainful employment, may demonstrate a level of vigor inconsistent with the allegation of disability. The ALJ was entitled to consider plaintiff's level of work activity as detracting from her allegations of disabling pain. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996)(claimant's work activities during claimed disability period held inconsistent with subjective complaints); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (claimant's record of contemplating work as evidenced by applying for jobs during claimed disability period indicates that claimant did not view his pain as disabling); Naber v. Shalala, 22 F.3d 186, 188 (8th Cir.1994) (work performed during any period a claimant alleges that he or she was under a disability may demonstrate an ability to engage in substantial gainful activity).

The ALJ noted that, during the course of the hearing, plaintiff did not appear to be in any obvious credible physical or mental discomfort. "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson, 240 F.3d at 1147-48 (citing Smith, 987 F.2d at 1375).

It does not appear that this is a case in which the ALJ placed undue weight on any of the factors on which plaintiff alleges error. To the contrary, it is apparent that the ALJ in this case thoroughly reviewed all of the evidence of record, explicitly considered the Polaski factors, noted several inconsistencies in the evidence as a whole, and gave good reasons for discrediting plaintiff's complaints. Having reviewed the

record and having carefully considered all of plaintiff's allegations, the undersigned concludes that the ALJ's credibility determination is supported by substantial evidence on the record as a whole. See Hogan, 239 F.3d at 962 (Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, that decision should be upheld); see also Tellez, 403 F.3d at 957 (The credibility determination is primarily for the Commissioner, and not the courts, to make).

    B.   RFC Determination

In this case, after thoroughly analyzing and discussing the medical evidence of record, the ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work, with some exceptions, as noted, supra. The ALJ concluded that plaintiff remained able to perform her past relevant work as a court reporter, medical transcriptionist, and office clerk, inasmuch as this work did not require the performance of work-related activities precluded by her residual functional capacity. Plaintiff challenges the ALJ's decision, arguing that he failed to properly consider her headaches and arm spasms; suggests that the ALJ's determination is unsupported; and contends that the only residual functional capacity assessment supported by the record is that plaintiff cannot report to work on a consistent basis and is therefore unemployable. Plaintiff asks that this Court reverse the Commissioner's decision with directions to enter benefits. Review of the ALJ's RFC determination reveals no error.

Residual functional capacity is what a claimant can still do despite her limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). A disability claimant has the burden of establishing her RFC. See Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer, 245 F.3d at 704. The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; McKinney, 228 F.3d at 863.

In the case at bar, the ALJ appropriately considered plaintiff's testimony concerning headaches, and appropriately considered her allegations of symptoms of muscle spasms in her neck and numbness in her right hand, but concluded that the record contained no evidence of any persistent spasm. The ALJ was under no duty to include headaches or arm spasms in formulating plaintiff's RFC because the record did not contain substantial evidence that plaintiff's headaches or arm spasms caused any functional restrictions. In February of 2006, Dr. Gornet noted

that plaintiff denied significant arm pain, and in December of 2006, Dr. Lee diagnosed plaintiff with neck and bilateral arm pain, but did not mention arm spasms. In October of 2006, plaintiff reported having headaches, but the record fails to document ongoing treatment for headaches; a diagnosis related to headaches; or any indication that plaintiff required prescription medication and/or follow-up medical treatment for headaches. The record also fails to document that any physician ever imposed any specific work-related restrictions related to headaches or arm spasms. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990) (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

As discussed above, the ALJ appropriately considered plaintiff's daily activities and her failure to take strong prescription pain medications as inconsistent with her allegations of debilitating symptoms. See Harris v. Barnhart, 356 F.3d 926,

929-30 (8th Cir. 2004)(claimant's complaints of debilitation from headaches were inconsistent with her daily activities and failure to seek any treatment beyond over-the-counter medications). Plaintiff did not seek regular, consistent medical attention for headaches or arm spasms, Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain), nor did she regularly complain of debilitating headaches or arm spasms when receiving other treatment during the relevant time period. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment). Plaintiff testified that she took only over-the-counter medication for headaches, which is inconsistent with complaints of disabling pain. See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (The lack of strong prescription pain medication supports the ALJ's findings).

Plaintiff's suggestion that the ALJ's RFC assessment was not based upon medical evidence is without merit. A disability claimant has the burden of establishing her RFC, Masterson, 363 F.3d at 737, and the ALJ is required to base his RFC determination on all of the relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson, 51 F.3d at 779; Goff, 421 F.3d at 793. The ALJ in this case did just that. He based plaintiff's RFC on the medical and non-medical

evidence of record, and he included the restrictions that were supported by the medical evidence of record and credited plaintiff's testimony regarding limitations that were not contradicted by the record. Dr. Lee suggested that plaintiff might have problems with temperature sensation, and the ALJ included appropriate limitations in plaintiff's RFC. Plaintiff testified that she could sit for extended periods of time, and the ALJ limited her to sedentary work, which involves sitting for most of the workday. Plaintiff testified that she had difficulty lifting her arms high, and the ALJ determined that plaintiff could not do overhead work. It was proper for the ALJ to credit plaintiff's self-report of her abilities and limitations. See Gallus v. Callahan, 117 F.3d 1061, 1064 (8th Cir. 1997) (finding that the ALJ's conclusion that plaintiff could lift twenty pounds occasionally was supported by the evidence inasmuch as plaintiff admitted that she could do so).

An ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; see also Anderson, 51 F.3d at 779 ("The need for medical evidence, however, does not require the Secretary to produce additional evidence not already within the record.") An ALJ may issue a decision without obtaining additional medical evidence when, as here, other evidence in the record provides a sufficient basis for the ALJ's decision. Naber, 22 F.3d at 189. The ALJ based his RFC assessment on all of the credible, relevant evidence of record. He was under no

obligation to include limitations related to headaches and/or arm spasms in plaintiff's RFC, nor was the ALJ required to develop the record further regarding these alleged conditions. Furthermore, plaintiff fails to recognize that the ALJ's RFC assessment was partially based upon his appropriate decision to discredit plaintiff's allegations of disabling symptoms. It certainly cannot be said, as plaintiff suggests, that the only conclusion supported by the evidence is that plaintiff is unable to report to work, and that this Court must therefore reverse with directions to award benefits.

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ based his decision on all of the credible, relevant evidence of record, and properly weighed all of the medical and other evidence. For the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

C.   Opinion Evidence

Plaintiff next contends that the ALJ improperly relied upon the lay opinion provided by state agency counselor M. Huggins. Plaintiff contends that counselor Huggins' opinion was made without the benefit of Dr. Meyer's September 17, 2007 opinion or evidence later placed in the record, and was contrary to Dr. Meyer's opinion. Plaintiff also argues that the ALJ erroneously discounted

Dr. Meyer's opinion, and misinterpreted the Regulations when he stated that Dr. Meyer was not an acceptable medical source. Review of the ALJ's decision reveals no error.

Contrary to plaintiff's assertion, the ALJ in this case did not place undue weight upon the residual functional capacity assessment prepared by the state agency counselor, M. Huggins. In fact, the ALJ stated that he "generally accepted" the opinion, and acknowledged that it was not entitled to the deference afforded to a medical source opinion. (Tr. 17). Specifically, the ALJ wrote:

> The undersigned generally accepts the physical residual functional capacity assessment of the state agency counselor, M. Huggins, who determined the claimant was limited to sedentary exertional work activity with non-exertional limitations (Exhibit 11F). The opinions of a non-examining lay person are not entitled to deference as a medical source opinion, however, they were considered and weighed as those of a lay person knowledgeable in the evaluation of the medical issues in disability claims under the Social Security Act. The undersigned generally accepts the opinion of the non-examining state agency counselor because they are supported and consistent with the objective medical evidence of record.
>
> (Id.)

Plaintiff also contends that the lay examiner's report lacked the benefit of Dr. Meyer's September 17, 2007 opinion that plaintiff was permanently disabled and could not work, and that the examiner's report was contrary to Dr. Meyer's opinion. As the ALJ correctly noted, however, Dr. Meyer's opinion that plaintiff was

permanently disabled and unable to work as a court reporter was not the type of opinion that is entitled to controlling weight because the ultimate conclusion of whether plaintiff could sustain gainful employment is a decision reserved for the Commissioner.  Indeed, "[a] medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."  <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005) (citing <u>Stormo v. Barnhart</u>, 377 F.3d 801, 807 (8th Cir. 2004).  Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner.  <u>See</u> 20 C.F.R. § 404.1527(e)(2).

In explaining his reasons for giving Dr. Meyer's opinion "little weight," the ALJ wrote:

> Little weight is given to the opinions of Roy P. Meyer, D.C., indicating the claimant was disabled due to congenital cervical spine malformations (Exhibits 12F and 16F).  Statements that the claimant is disabled are not medical opinions, but administrative findings dispositive of a case, requiring familiarity with the regulations and legal standards set forth therein.  Such issues are reserved to the Commissioner to determine the ultimate issue of disability.
>
> . . .
>
> Further, the opinions of a chiropractor, are not generally recognized as an "acceptable source".  The opinion represents other source opinion and is entitled to significantly less weight than an acceptable medical source opinion (20 C.F.R. 404.1513(d)(1), 416.913(d)(1), and SSR 06-3p).

(Tr. 17).

In her brief, plaintiff characterizes Dr. Meyer as her treating chiropractor, and argues that the ALJ erred in discounting his opinion, and misinterpreted the Regulations by finding that, because he was a chiropractor, he was not considered an acceptable medical source under the Regulations. (Plaintiff's Brief at page 4; Plaintiff's Supplemental Brief at page 4). Plaintiff's argument is not well-taken. "A 'treating source' is defined as a 'physician, psychologist, or other *acceptable medical source*' who treats the claimant." Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (citations omitted)(emphasis added). The Regulations provide that evidence to establish an impairment must come from "acceptable medical sources," which are defined as licensed medical or osteopathic physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). Chiropractors, like Dr. Meyer, are specifically defined elsewhere in the Regulations as "other sources" whose opinions may help understand how a claimant's impairments affect her ability to work. 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1). The ALJ's treatment of Dr. Meyer's opinion is entirely consistent with the Regulations. The ALJ did not ignore Dr. Meyer's opinions; he merely stated that he was giving it little weight. The ALJ properly considered Dr. Meyer's opinion as an aid to understanding how plaintiff's impairments affected her ability to work, and not

as an acceptable source of medical information to prove disability. Substantial evidence supports the ALJ's treatment of Dr. Meyer's opinion.

There is no consequence to the fact that the lay examiner's June 6, 2007 report did not take into account evidence later placed into the record. As discussed above, the ALJ properly weighed Dr. Meyer's opinion and properly considered it as an aid to understanding plaintiff's limitations. In addition, on October 8, 2007, Dr. Meyer noted that plaintiff was "doing great." (Tr. 350). The balance of the medical evidence dated after the lay examiner's report reflects treatment for temporary medical problems, such as plaintiff's treatment related to her thyroid. In addition, as discussed above, the fact that the lay examiner did not have access to other medical evidence has little relevance because the ALJ himself conducted an exhaustive review of all of the medical evidence of record.

D. Fully and Fairly Developed Record

Plaintiff also argues that the ALJ failed to fully and fairly develop the record because he did not send plaintiff for an evaluation by an orthopedic specialist, or ask for a more detailed report from one of her treating physicians. Plaintiff is not specific regarding which of plaintiff's treating physicians the ALJ should have re-contacted. Review of the record reveals no error.

It is well-settled that the ALJ is required to ensure a

fully and fairly developed record. Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). An ALJ is required to order a consultative examination when the evidence as a whole is insufficient to support a decision on a claim. See 20 C.F.R. §§ 404.1519a(b); 416.919a(b). An ALJ is required to re-contact a physician when the ALJ is unable to determine from the record whether the claimant is disabled. 20 C.F.R. §§ 404.1512(e), 404.1519a(b), 416.912(e), 416.919a(b); see also Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Anderson, 51 F.3d at 779.

In this case, there is no indication that the ALJ felt unable to make the assessment he did and, as discussed above, substantial evidence supports the ALJ's decision. Plaintiff also fails to acknowledge that the ALJ's RFC determination was influenced by his determination that plaintiff's allegations were not fully credible and, for the reasons discussed above, this Court defers to that determination. See Hogan, 239 F.3d at 962; Tellez, 403 F.3d at 957.

E.  <u>Vocational Expert Testimony</u>

Plaintiff next alleges error in the hypothetical questions the ALJ posed to the VE.  Plaintiff argues that the ALJ's hypotheticals were insufficient because the ALJ failed to include headaches and arm spasms.  Review of the decision reveals no error.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ."  <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001) (citing <u>Prosch</u>, 201 F.3d at 1015).  As discussed above, substantial evidence supports the ALJ's RFC and credibility determinations, and the evidence of record fails to document that headaches or arm spasms imposed any significant restrictions on plaintiff's functional abilities.  Likewise, the ALJ's hypothetical questions included all of the impairments he found to be credible.  <u>See</u> <u>Strongson</u>, 361 F.3d at 1072 -1073 (VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination).  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated."  <u>Hunt</u>, 250 F.3d at 625 (citing <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997)).  The ALJ's failure to make specific reference to those conditions was therefore not erroneous.  <u>See</u> <u>Haynes v. Shalala</u>, 26 F.3d 812, 815 (8th Cir.1994) (ALJ's failure to make specific reference to headaches in hypothetical to VE was not error because there was no medical

evidence that condition imposed any restrictions on claimant's functional abilities).

Plaintiff challenges the ALJ's conclusion that she could return to her past relevant work as a court reporter, arguing that the ALJ ignored Dr. Meyer's opinion that she could not return to this job. As discussed above, Dr. Meyer's opinion is not entitled to controlling weight because he is not an acceptable medical source, and because any medical source opinion that an applicant is 'disabled' or 'unable to work' pertains to an issue reserved for the Commissioner, and is not the type of medical opinion entitled to controlling weight. Ellis, 392 F.3d at 994 (citing Stormo, 377 F.3d at 807). In determining that plaintiff could perform her past relevant work, the ALJ properly relied upon the VE's testimony regarding the demands of plaintiff's past work, and concluded that plaintiff could perform her past work as it is generally performed. See Strongson, 361 F.3d at 1072 -1073 (VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination); Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997) (an ALJ is entitled to rely upon the testimony of a vocational expert when, as here, such testimony is based upon a correctly phrased hypothetical that captures the consequences of a claimant's abilities and deficiencies); see also Evans v. Shalala, 21 F.3d 832, 833-34 (8th Cir. 1994) (an ALJ is not required to classify past relevant work solely on basis of physical demands of actual past work; if the ALJ

finds that claimant can carry out her job as performed generally within the national economy, she is not disabled).

In addition, as the Commissioner notes, even if error could be found in the ALJ's determination regarding plaintiff's past relevant work, such error would be harmless because the ALJ alternately found that plaintiff could perform other work in the national economy. The ALJ based this determination on the VE's testimony that the hypothetical individual the ALJ described could perform the sedentary, unskilled jobs of hand packager and assembler. Because the hypothetical questions were properly formulated, the VE's testimony constitutes substantial evidence supporting the ALJ's decision. See Strongson, 361 F.3d at 1072 - 1073; Taylor, 118 F.3d at 1278.

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of March, 2011.